*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 07a0195p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

No. 05-6272

TRAVON GARDNER,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Middle District of Tennessee at Cookeville.
No. 04-00017—Todd J. Campbell, Chief District Judge.

Submitted: November 29, 2006

Decided and Filed: May 25, 2007

Before: BOGGS, Chief Judge; COOK, Circuit Judge; ROSE, District Judge.[*]

_____

**COUNSEL**

**ON BRIEF:** Deanna Bell Johnson, Brentwood, Tennessee, for Appellant. Harold B. McDonough, Jr., ASSISTANT UNITED STATES ATTORNEY, Nashville, Tennessee, for Appellee.

_____

**OPINION**

_____

ROSE, District Judge. On May 19, 2005, Travon Gardner was convicted in the United States District Court for the Middle District of Tennessee on four counts: (1) conspiracy to possess, with intent to distribute, five kilograms or more of cocaine, in violation of 21 U.S.C. § 846; (2) aiding and abetting the attempt to possess, with intent to distribute, five or more kilograms of cocaine, in violation of 21 U.S.C. § 846 and 18 U.S.C. § 2; (3) aiding and abetting the possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. §§ 924(c) and 2; and (4) aiding and abetting a felon in the possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(1) and 2. Gardner received concurrent sentences of 240 months of imprisonment for the first two offenses and a 60-month consecutive sentence on the third offense. On the fourth offense, Gardner received a sentence of 120 months of imprisonment, which was to run concurrently with his 240-month sentences on the first two convictions. Gardner's total sentence was 300 months of imprisonment.

Gardner filed a motion for a new trial, which was denied by the district court. He then

_____

[*]The Honorable Thomas M. Rose, United States District Judge for the Southern District of Ohio, sitting by designation.

1

appealed his conviction to this court. For the following reasons, we AFFIRM Gardner's convictions on the first three counts and REVERSE on the final count. Because Gardner's sentence of 300 months will remain the same despite the reversal of one of his convictions, we AFFIRM Gardner's sentence and decline to remand the case to the district court for resentencing.

## I.      BACKGROUND

Ricky Collins was arrested for drug violations in the fall of 2003 by Mike Thompson, Director of the Fifteenth Judicial Drug and Violent Crimes Task Force (the "Task Force"), and his agents. After his arrest, Collins worked as an informant for the Task Force. Collins had been a middle-man drug dealer who brokered deals involving ounces of cocaine. Collins brokered cocaine that he received from Lorenzo McMillion.

In July 2004, Collins, working as an informant, contacted McMillion and told him that he had a source in Texas who could provide kilogram quantities of cocaine. McMillion responded that he would have to get in touch with his people to see what they wanted and asked Collins for the price for five kilograms. Collins indicated that the price would be between $10,000 and $15,000 per kilogram.

McMillion then contacted Steve Griffin, an individual he had been dealing with for four or five years, and quoted him the price range given by Collins. Griffin agreed to purchase the five kilograms. McMillion believed from his experience dealing with Griffin that Griffin had enough money to purchase the five kilograms.

Collins then put McMillion in touch with Collins's "Texas supplier" by means of a three-way telephone call on July 13, 2004. Collins's "Texas supplier" was really Thompson. Thompson reached an agreement with McMillion to provide five kilograms of cocaine to McMillion at a price of $18,000 per kilogram. The two agreed to meet.

McMillion later went to Griffin's house near the airport off Donelson Pike in Nashville, Tennessee. There he found Griffin with Charles Hassell and Travon Gardner. McMillion had previously seen Gardner at Griffin's house. Griffin questioned McMillion about whether McMillion could trust the people who were selling the cocaine. McMillion responded that he would check the cocaine. He borrowed digital scales from Griffin to do so.

On July 15, 2004, McMillion met with Collins and Thompson at a Waffle House restaurant in Mt. Juliet, Tennessee. McMillion said he wanted to get four and a half ounces of the cocaine to test. Thompson refused and indicated that he was there to talk and not to do a transaction. However, to show that he was a genuine supplier, Thompson took McMillion to another location where he showed McMillion a duffle bag containing five tape-wrapped kilograms of cocaine. The duffle bag was in the back seat of a red Chevy truck. Thompson had borrowed the five kilograms of cocaine from a drug task force from Shelby County, Tennessee.

After seeing the cocaine, McMillion returned to Griffin's house. When he arrived, Griffin, Hassell, and Gardner were in the kitchen where they all talked about the proposed drug deal. McMillion reported that he had seen the cocaine but had not been able to get a sample. At Griffin's suggestion, McMillion, Hassell, and Gardner left Griffin's house in Griffin's truck to try to find the red Chevy truck that contained the five kilograms of cocaine. The three planned to steal the truck and its contents. Gardner took along an Interdynamic Model KG-99 handgun, a nine-millimeter weapon commonly refereed to as a "Tek-9."

At some point while McMillion, Hassell, and Gardner were driving around looking for the red Chevy truck, they stopped to purchase gas for their vehicle. When McMillion went to pay for

the gas, Gardner told him to purchase gloves and tape. McMillion bought a pair of gloves and some gray duct tape and gave them to Gardner. The three continued their search for the truck.

While they were driving around looking for the truck, the three men discussed what they would do if they found the truck. They planned to sit and wait until someone exited the truck. At that point, they would steal the truck at gunpoint. They planned for Gardner to drive the truck back to Griffin's house. However, when the three men could not find the truck, they returned to Griffin's house. Later that day, McMillion had a telephone conversation with Collins wherein McMillion told Collins that he still wanted the five kilograms and would have to stop and pick up the money.

McMillion then went to Griffin's house. Griffin first said that he might go ahead and purchase the cocaine with his money, but he then said that he had come up with another plan. On Griffin's instructions, Hassell and Gardner took out magazines and cut them up into pieces with the dimensions of dollar bills. They made nine stacks of the cut-up magazines with a one-hundred-dollar bill on top of each stack so that each stack appeared to be of one-hundred-dollar bills. Griffin put the nine stacks into a plastic bag, sealed the bag, and wrote "90k" on the bag. They planned to use the bag of money and magazine clippings in exchange for the cocaine.

McMillion, Hassell, and Gardner then left Griffin's house. Hassell brought the bag of money and Gardner brought two weapons, a Fabrique Nationale nine-millimeter pistol (the "Fabrique Nationale") and the Tek-9. McMillion told Gardner to take the guns back into the house. Gardner went into the house and returned with the guns. Gardner indicated that Griffin had said that the guns had to be taken along. McMillion, Hassell, and Gardner then left in McMillion's car. McMillion was driving, Hassell was in the front passenger seat along with the bag of money and magazine clippings, and Gardner was in the back seat behind Hassell.

McMillion, Hassell, and Gardner next met with Collins. Collins stood outside the car while McMillion showed him the bag of "money." Collins then got into the back seat of McMillion's car behind McMillion and next to Gardner. When he was sitting in the back seat next to Gardner, Collins noticed that Gardner had something pulled up next to him. It was covered up with clothing and Collins thought it was a gun.

Collins handed his phone to McMillion so McMillion could talk to Thompson. Thompson told McMillion that the deal would take place at a motel up the highway. Collins exited McMillion's car and McMillion, Hassell, and Gardner followed Collins to the motel. At this point, McMillion heard a noise from the area where Gardner was sitting that sounded like a bullet being loaded in the chamber of a gun. McMillion warned Gardner to be sure to put the gun on safety. As McMillion, Hassell, and Gardner drove up the highway following Collins, they discussed a new plan to obtain the cocaine. The plan they discussed was for McMillion to enter the motel room unarmed and make sure the people there had no weapons. Hassell and Gardner would then come in with weapons drawn and steal the drugs. They also planned to tape up Thompson and Collins.

When they arrived at the motel, McMillion entered the motel room unarmed and Hassell and Gardner remained in McMillion's car. When inside, McMillion became suspicious of a door to an adjoining room that was ajar. When he opened this door, he was arrested by waiting officers and the signal was given to arrest the two men in McMillion's car. Officers then surrounded the car but could not see inside because of the car's tinted windows. Once the car doors were opened, Hassell was found in the front passenger seat and Gardner was in the back seat behind Hassell.

The officers found the two guns under the front passenger seat. One, the Tek-9, was toward the front and positioned so that it was within reach of the passenger in the front seat. The other gun, the Fabrique Nationale, was positioned so that it was within reach of the passenger in the rear seat. Both guns were manufactured outside the state of Tennessee and loaded with ammunition. Each had

a round in the chamber. No fingerprints were found on either weapon. One of the weapons was registered, but not to Gardner. A body search of Gardner revealed a pair of brown gloves and a new roll of duct tape.

On August 25, 2004, a federal grand jury in the Middle District of Tennessee returned a five-count indictment charging Gardner, McMillion, and Hassell with several offenses. All three were charged with conspiracy to possess, with intent to distribute, five or more kilograms of cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and 846. All three were also charged with attempting to possess, with intent to distribute, five or more kilograms of cocaine, in violation of 21 U.S.C. § 846 and 18 U.S.C. § 2. All three also were charged with possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. §§ 924(c) and 2. In addition, Gardner was charged with being a felon in possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(1), 924 and 2. With regard to all but the conspiracy count, the government offered both principal and aider-and-abettor theories of liability.

The case was originally scheduled for trial on November 2, 2004. On October 8, 2004, all three defendants filed motions to continue the trial. McMillion's and Hassell's motions to continue were granted and the trial was rescheduled for February 8, 2005. On November 23, 2004, Hassell filed a Motion To Suppress Evidence. On December 30, 2004, Gardner filed a motion to adopt and join in Hassell's motion to suppress. Gardner's motion to adopt was granted on that same day. Following a hearing, the motion to suppress was denied. On January 26, 2005, Hassell filed another motion to continue. As a result, the trial date for all three defendants was reset to May 17, 2005.

McMillion entered a guilty plea on May 9, 2005, and Hassell entered a guilty plea on May 16, 2005. Also on May 16, 2005, the government filed an information for enhanced punishment for Gardner pursuant to 21 U.S.C. § 851, based on Gardner's prior felony drug conviction. Gardner was tried before a jury on May 17 and 18, 2005 and convicted on four counts. Gardner now appeals those convictions.

## II.    DISCUSSION

Gardner raises four challenges to his convictions. We address each in turn.

### A.    Sufficiency of the Evidence

Gardner first argues that there was insufficient evidence from which a jury could find him guilty beyond a reasonable doubt of any of the four charges against him. We disagree with Gardner with respect to each conviction, except his aiding-and-abetting conviction under 18 U.S.C. § 922(g).

### 1.    Standard of Review

The government argues that Gardner did not make a motion for judgment of acquittal at any time before the trial court and, therefore, forfeited his right to challenge the sufficiency of the evidence absent a showing of a manifest miscarriage of justice. However, it is well established that a defendant may preserve a challenge to the sufficiency of the evidence by moving for a new trial on that basis under Federal Rule of Criminal Procedure 33. *See United States v. Carr*, 5 F.3d 986, 991 (6th Cir. 1993) (citing *United States v. Williams*, 940 F.2d 176, 180 (6th Cir. 1991)). *See also United States v. Monus*, 128 F.3d 376, 385 (6th Cir. 1997) (citing *Carr*, 5 F.3d at 991). In this case, Gardner moved for a new trial following entry of the judgment against him. This motion includes, among other things, challenges to the sufficiency of the evidence. Thus, this argument by the government is not well-founded.

A defendant challenging the sufficiency of the evidence has a "very heavy burden." *United States v. Chavis*, 296 F.3d 450, 455 (6th Cir. 2002). When reviewing an insufficient-evidence claim,

this court must decide whether, after viewing the evidence in a light most favorable to the government, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *United States v. Humphrey*, 279 F.3d 372, 378 (6th Cir. 2002); *United States v. Gibbs*, 182 F.3d 408, 421 (6th Cir. 1999). *See also Jackson v. Virginia*, 443 U.S. 307, 319 (1979).

When deciding whether any rational trier of fact could have found the essential elements of the crime, this court does not "weigh the evidence, consider the credibility of witnesses, or substitute its judgment for that of the jury." *Chavis*, 296 F.3d at 455 (quoting *United States v. Ferguson*, 23 F.3d 135, 140 (6th Cir. 1994)). A judgment is reversed on insufficiency-of-the-evidence grounds "only if [the] judgment is not supported by substantial and competent evidence upon the record as a whole." *United States v. Barnett*, 398 F.3d 516, 522 (6th Cir. 2005); *United States v. Beddow*, 957 F.2d 1330, 1334 (6th Cir. 1992).

## 2.       Conspiracy To Violate Drug Laws

Gardner argues that there was insufficient evidence from which a jury could have found him guilty of conspiracy to possess five or more kilograms of cocaine, with intent to distribute, in violation of 21 U.S.C. §§ 841(a)(1) and 846. To sustain a conviction for drug conspiracy under section 846, the government must prove beyond a reasonable doubt: (1) an agreement to violate drug laws; (2) knowledge of and intent to join the conspiracy; and (3) participation in the conspiracy. *United States v. Layne*, 192 F.3d 556, 567 (6th Cir. 1999) (citing *United States v. Welch*, 97 F.3d 142, 148-49 (6th Cir. 1996)). These elements may be shown by either direct or circumstantial evidence. *United States v. Avery*, 128 F.3d 966, 971 (6th Cir. 1997). Gardner challenges each element of the conspiracy charge on appeal.

Regarding the first element, the government need not prove the existence of a formal or express agreement among the conspirators. *Id.* at 970. Even a tacit or mutual understanding among the conspirators is sufficient. *Id.* at 970-71. Yet, an agreement must be shown beyond a reasonable doubt. *Id.* at 971. There can be no question in this case that the government put forward sufficient evidence of the existence of an agreement. Mike Thompson, the undercover officer posing as a drug supplier, coordinated his dealings with McMillion through Collins, an informant. McMillion's testimony provides substantial support for the existence of the conspiracy, including the agreement initially to purchase the five kilograms of cocaine. McMillion also testified to the later steps of the plan, including the search for the truck and the trip to the motel.

McMillion's testimony is corroborated by several items of physical evidence. First, the duct tape and gloves, which McMillion said Gardner asked for during the search for the truck, were found in the car in which Gardner and Hassell were arrested. Second, the guns Gardner allegedly brought to the vehicle were also found in the car. Third, it is clear from the conspirators' arrival at the motel that they had a common plan: to follow the instructions of Collins (the informant) who told them precisely where to go to accomplish the drug purchase. There was sufficient evidence to show an agreement existed.

Regarding the second and third elements, the government must show the willful membership of the defendant in the conspiracy, but the government need not prove that the defendant committed an overt act in furtherance of the conspiracy. *Layne*, 192 F.3d at 567. Further, while the connection between the defendant and the conspiracy need only be slight, mere association with conspirators is not enough to establish participation. *United States v. Pearce*, 912 F.2d 159, 162 (6th Cir. 1990). Finally, knowledge of and participation in the common purpose and plan of a conspiracy may be inferred from the defendant's actions and reactions to the circumstances. *United States v. Barrett*, 933 F.2d 355, 359 (6th Cir. 1991) (citing *United States v. Christian*, 786 F.2d 203, 211 (6th Cir. 1986)).

There is sufficient evidence that Gardner was a willful participant in the conspiracy. According to McMillion's testimony, Gardner was part of the discussion in the kitchen at Griffin's house, where the three men discussed how to acquire the cocaine. McMillion also testified about Gardner's participation in the search for the red truck, Gardner's involvement in the fake money scheme, Gardner's desire to acquire duct tape and gloves for the intended assault on the motel room, and Gardner's bringing of the guns to the car. Gardner also gave an alternative name ("Anthony Caruthers") to police at the scene of the arrest. A reasonable jury could have found that Gardner was a willful participant in the conspiracy.

Thus, viewing the evidence in a light most favorable to the government, a rational trier of fact could have found that Gardner engaged in a conspiracy to possess with intent to distribute cocaine. Gardner's challenge to the sufficiency of the evidence on the conspiracy count therefore is rejected.

### 3.          Aiding and Abetting Attempt To Possess Cocaine

Gardner next argues that there was insufficient evidence to find that he aided and abetted McMillion or Hassell in their attempt to possess cocaine with intent to distribute. In order to sustain Gardner's conviction on this count, the government must have produced sufficient evidence that (1) McMillion or Hassell committed the principal offense and (2) that Gardner aided and abetted the commission of that offense.

In order to secure a conviction of a defendant for aiding and abetting an offense, the government must show: (1) an act by a defendant that contributes to the execution of a crime; and (2) the intent to aid in the crime's commission. *United States v. Lowery*, 60 F.3d 1199, 1202 (6th Cir. 1995); *United States v. Lawson*, 872 F.2d 179, 181 (6th Cir. 1989). As applied to the offense of aiding and abetting an attempt to possess with intent to distribute, the government accordingly must prove that the principal committed the "attempt" offense. That is, the government must prove that the principal had the intent to commit the drug offense and that the principal committed an overt act that constituted a substantial step toward the commission of the drug offense. *United States v. Wesley*, 417 F.3d 612, 618 (6th Cir. 2005); *United States v. Pennyman*, 889 F.2d 104, 106 (6th Cir. 1989). The "substantial step" consists of objective acts that mark the defendant's conduct as criminal in nature. *Pennyman*, 889 F.2d at 106.

Gardner argues that he did not commit any act other than being present in the car when the three men went to pick up the cocaine. However, viewing the evidence in the light most favorable to the government, a reasonable jury could have found that the evidence established that Gardner aided or abetted either McMillion's or Hassell's attempt to possess cocaine with intent to distribute. First, there was substantial evidence that Hassell and McMillion intended to acquire and took substantial steps toward acquiring cocaine. They discussed how to acquire the cocaine in Griffin's kitchen, searched for the red truck in order to steal the cocaine at gunpoint, cut up magazine clippings to use as fake money to buy the cocaine, and went on a second mission to a motel room to steal the cocaine by force. A jury could have concluded that Hassell and McMillion attempted to possess cocaine with intent to distribute.

Second, there is substantial evidence that Gardner committed an act that assisted in the crime's commission and had the intent to aid his accomplices. Gardner was present during every aspect of the crime discussed in the previous paragraph. He also brought the firearms along on two separate attempts to acquire the cocaine and asked McMillion to purchase gloves and duct tape for the motel-room mission. A rational trier of fact could have found that Gardner aided and abetted McMillion's or Hassell's attempt to possess cocaine with intent to distribute. Thus, Gardner's allegation of insufficiency of the evidence on this count fails.

**4.        Aiding and Abetting Possession of a Firearm in Furtherance of Drug Trafficking**

Gardner next argues that there was insufficient evidence that he aided and abetted the possession of a firearm in furtherance of drug trafficking, in violation of 18 U.S.C. § 924(c). We find his argument unavailing. A rational trier of fact could have found Gardner guilty of aiding and abetting Hassell's possession of a firearm in furtherance of a drug trafficking crime.

We have held that, to sustain a conviction under § 924(c) for aiding and abetting, the government must prove "that the defendant, as the accomplice, associated and participated in the use of the firearm in connection with the underlying . . . crime." *United States v. Franklin*, 415 F.3d 537, 554-55 (6th Cir. 2005) (citing *Rattigan v. United States*, 151 F.3d 551, 558 (6th Cir. 1998) (citations omitted)). *See also United States v. Morrow*, 977 F.2d 222, 231 (6th Cir. 1992). The government can meet that burden by showing that the defendant both knew that the principal was armed and acted with the intent to assist or influence the commission of the underlying predicate crime. *Franklin*, 415 F.3d at 554-55. Thus, in this case, the government was required to prove that Gardner knew one of his accomplices possessed a gun in furtherance of a drug trafficking offense and that Gardner acted with the intent to assist or influence the commission of the underlying drug trafficking crime.

At least one of Gardner's accomplices possessed a firearm in furtherance of a drug trafficking crime. According to McMillion's testimony, Gardner brought two weapons to the car before the three men drove to the motel, where they were either to purchase drugs with fake money or steal the drugs at gunpoint. While in the car on the way to the motel, Gardner handed one of the guns to Hassell, who was seated in the front passenger seat. That evidence suffices to show that Hassell actually possessed a firearm. *Cf. United States v. Moreno*, 933 F.2d 362, 373 (6th Cir. 1991).

Hassell also possessed that weapon "in furtherance of" a drug trafficking offense. According to the evidence adduced at trial, the plan from that point forward was to steal the cocaine *at gunpoint* from the "dealers" in the motel room. The guns were strategically located in the automobile to be within reach of Hassell and Gardner. The very purpose of having the guns in the car was to aid in the theft of the drugs. A reasonable jury could have concluded that Hassell possessed a firearm in furtherance of the underlying drug conspiracy. *Cf. United States v. Mackey*, 265 F.3d 457, 461-62 (6th Cir. 2001).

Because Gardner handed Hassell a weapon, a reasonable jury could have concluded both that Gardner knew Hassell was armed and that Hassell was armed to further the underlying drug offense. That evidence, combined with the Gardner's clear criminal intent (which we have already discussed in the conspiracy context), leads to the inexorable conclusion that a jury reasonably could have found that Gardner aided and abetted the possession of a firearm in furtherance of a drug trafficking crime. We accordingly reject his insufficiency challenge to this conviction.

**5.        Aiding and Abetting a Felon In Possession of a Firearm**

Gardner next argues that there was insufficient evidence that he aided and abetted a felon in possession of a firearm. Gardner was charged with being a felon in possession of a firearm, pursuant to 18 U.S.C. § 922(g)(1). He was also charged in this same count as an aider and abettor, pursuant to 18 U.S.C. § 2. The verdict form is clear on which theory the jury relied upon: Gardner was found not guilty as a principal, but was found guilty as an aider and abettor.

Therefore, for Gardner's conviction on this count to stand, he must have aided and abetted either Hassell's or McMillion's commission of the principal offense. Thus, we must ask whether Hassell or McMillion could have been convicted of violating § 922(g)(1) as principals. The elements of being a felon in possession of a firearm, pursuant to 18 U.S.C. § 922(g)(1), are: (1) the

defendant had a previous felony conviction; (2) the defendant possessed a firearm; and (3) the firearm traveled in or affected interstate commerce. *United States v. Kincaide*, 145 F.3d 771, 782 (6th Cir. 1998). The record contains no evidence that Hassell was a convicted felon.

Thus, Gardner's conviction on this count depends first on whether McMillion could have violated § 922(g)(1). As to the first element of being a felon in possession of a firearm, evidence was presented to the jury that McMillion had previously been convicted of at least two felony drug charges. Indeed, the jury heard that he had pled guilty to violating § 922(g) in this matter.

Moreover, a reasonable jury could have concluded that McMillion possessed a firearm. Possession may be either actual or constructive. Actual possession means that the possessor had physical control over the weapon, whereas "[c]onstructive possession exists when a person does not have actual possession but instead knowingly has the power and the intention at a given time to exercise dominion and control over an object, either directly or through others." Moreover, "[p]roof that 'the person has dominion over the premises where the firearm is located' is sufficient to establish constructive possession." *Kincaide*, 145 F.3d at 782 (citing *United States v. Clemis*, 11 F.3d 597, 601 (6th Cir. 1993) (per curiam), and *United States v. Snyder*, 913 F.2d 300, 304 (6th Cir.1990)).

There is no evidence in the record that McMillion ever *actually* possessed a firearm. Instead, the evidence shows that Gardner and Hassell were the actual possessors. However, a jury could have concluded that McMillion had constructive possession over the two guns in the car. McMillion was Griffin's primary representative when dealing with Thompson, whom McMillion thought was a drug-dealer from Texas. The car belonged to McMillion and he was driving the three men to the motel for the purpose of using the firearms to commit a drug trafficking offense. He acquiesced in Gardner's bringing of the guns and told Gardner to put the safety on. It was McMillion's role in the ultimate plan to enter the motel room and check if the "dealers" were armed. If they were not, McMillion was to return to the car, bring his armed coconspirators into the motel room, and steal the cocaine at gunpoint.

Based on that evidence, a reasonable jury could have found that McMillion had the "power and the intention at a given time to exercise dominion and control over a firearm, either directly or through others," *Clemis*, 11 F.3d at 601, and thus that McMillion constructively possessed the weapons in the car. As to the third element of the § 922(g) offense, Gardner conceded that the two weapons found had traveled in interstate commerce. Thus, there is sufficient evidence from which a jury could have concluded that McMillion violated § 922(g) as a principal.

However, for Gardner's conviction to stand, there must also be sufficient evidence to show that Gardner aided and abetted McMillion in the commission of that crime. The elements that the government must show to prove aiding and abetting are: (1) an act by a defendant that contributes to the commission of a crime; and (2) the intent to aid in the commission of the crime. *Lawson*, 872 F.3d at 181. Because there is evidence that Gardner brought both weapons into the car, Gardner certainly committed an act that contributed to McMillion's commission of the offense. Thus, we now consider whether Gardner had the required intent to aid in McMillion's commission of the crime.

We have yet to decide whether this element requires proof that the aider and abetter knew or should have known that the principal, McMillion in this case, was a convicted felon. The circuits are split on this question. The Ninth Circuit has held that the government need not show that the defendant knew the principal was a felon. *United States v. Canon*, 993 F.2d 1439, 1442 (9th Cir. 1993); *United States v. Graves*, 143 F.3d 1185, 1188 (9th Cir. 1998) ("*Canon* decided the question of whether an aider and abettor is required to know of the principal's status as a felon."). Also, while the Seventh Circuit has not directly confronted this particular question, that court has held that

a defendant in this type of case need only share the principal's knowledge that the *principal* possessed a gun. *United States v. Moore*, 936 F.2d 1508, 1527-28 (7th Cir. 1991) ("Moore was clearly aware of Miles' use of a gun in both armed robberies and, thus, satisfied this prong of the 'aiding and abetting' test."). In contrast, the Third Circuit has held that the government must show that the defendant must know or have reasonable cause to know that the principal is a felon in order to sustain an aiding-and-abetting conviction under § 922(g). *United States v. Xavier*, 2 F.3d 1281, 1286 (3d Cir. 1993).

The Ninth and Seventh Circuits offer little reasoning for their conclusions. In *Canon*, 993 F.2d at 1442 (citations omitted), the Ninth Circuit provides almost no support for its holding, writing that, because the government did not have to show that the principal knew his own felonious status, the government only had to show that the aider and abettor "associated himself with [the principal's crime], that he participated in it as in something that he wished to bring about, [and] that he [sought] by his action to make it succeed." The Seventh Circuit followed similar reasoning, holding in passing that, because the "required state of mind" for a principal's § 922(g) violation is that the principal "knowingly possessed the gun,"the government must only show that the aider and abettor knew the principal possessed the gun. *Moore*, 936 F.2d at 1526-28 (citations omitted).

The Third Circuit decision, in contrast, is well-reasoned and we concur with it. The Third Circuit began by reiterating that the felon-in-possession statute, 18 U.S.C. § 922(g), is not a specific-intent statute. *Xavier*, 2 F.3d at 1286. However, the Third Circuit noted that "criminal liability for aiding and abetting a § 922(g) violation stands on a different footing because it depends on the status of the person possessing the firearm," a situation which "Congress addressed . . . [in] § 922(d)."[1] *Ibid.* The court then discussed that section of the statute, under which "one cannot be criminally liable without knowledge or reason to know of the transferee's status." *Ibid.* (citing *United States v. Murray*, 988 F.2d 518, 522 (5th Cir. 1993) ("It is the purchaser's status as a felon which makes the activity criminal. If the aider and abettor does not know this fact, it is difficult to say he shared in the criminal intent of the principal.")).

The Third Circuit concluded that to allow aider-and-abettor liability without requiring proof of knowledge of the status of the principal under § 922(g) would effectively circumvent the knowledge element in § 922(d) and would thus abrogate congressional intent. It is worth noting that the Ninth Circuit, in a later case regarding accessory-after-the-fact liability, criticized but could not overrule that court's holding in *Canon*. *See United States v. Graves*, 143 F.3d 1185, 1188 (9th Cir. 1998) ("Although we acknowledge that *Canon* decided the question whether an aider and abettor is required to know of the principal's status as a felon, we have serious reservations regarding the soundness of that determination. In particular, we note that the decision contains no analysis in support of its conclusion.").

As the Ninth Circuit noted in *Graves*, a felon who possesses a firearm can be presumed to have known of his own status as a felon. *Ibid.* However, a presumption that a third party has knowledge of the principal's felonious status is on shakier ground, particularly in light of Congress's requirement that the government show that a *§ 922(d)* defendant *knew or had cause to know* of the transferee's status. *Ibid.* We cannot countenance an interpretation of § 922(g) that would permit any ordinary gun dealer to be held criminally liable for "aiding" a third person's possession of a firearm without some knowledge or cause to know of that third person's status as a convicted felon, when that very same transaction would not be criminal under § 922(d) for "selling" the same gun. As such, we agree with the Third Circuit and hold that, in order for aiding-and-abetting liability to

---

[1] The statute reads, in pertinent part: "It shall be unlawful for any person to sell or otherwise dispose of any firearm to any person knowing or having cause to believe that such person . . . is under indictment for, or has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year[.]" 18 U.S.C. § 922(d).

attach under § 922(g), the government must show that the defendant knew or had cause to know that the principal was a convicted felon. *Xavier*, 3 F.3d at 1286.**2**

Therefore, in order for Gardner's conviction as an aider and abettor under § 922(g) to stand, the government must have presented some proof that Gardner knew or had cause to know of McMillion's status as a convicted felon. The government presented no such evidence. As such, no rational trier of fact could have concluded that Gardner aided and abetted McMillion's gun-possession. The evidence presented on this count was insufficient. Accordingly, we sustain this insufficiency challenge and remand with instructions for the district court to enter a judgment of acquittal on this count. *Cf. Burks v. United States*, 437 U.S. 1, 17-18 (1978).

## B.        Sentencing Entrapment

Gardner next argues that his sentence should be vacated because the government and its agents committed sentencing entrapment. Gardner did not raise the entrapment defense at trial or in any pre-trial proceedings. Therefore, we review this issue for plain error. *United States v. Causey*, 834 F.2d 1277, 1281 (6th Cir. 1987). Under that standard: "there must be (1) error, (2) that is plain, and (3) that affects substantial rights. If all three conditions are met, an appellate court may then exercise its discretion to notice a forfeited error, but only if (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." *United States v. Swafford*, 385 F.3d 1026, 1028 (6th Cir. 2004) (citing *Johnson v. United States*, 520 U.S. 461, 467 (1997)).

The second element of the test – that an error must have been plain to be correctable here – is fatal to Gardner's claim. Under that element, the error either must have been (a) obvious at trial or (b) obvious on appeal due to an intervening change in law, where the law at the time of trial was settled and clearly contrary to the law after the pertinent intervening change. *Johnson*, 520 U.S. at 467-68 (citing *United States v. Olano*, 507 U.S. 725, 734 (1993)).

Gardner can only establish plain error on this point if the alleged error should have been obvious to the district court, or if subsequent to his conviction the law on sentencing entrapment changed dramatically. However, neither this court nor the Supreme Court officially has recognized the theory of sentencing entrapment. *See Sosa v. Jones*, 389 F.3d 644, 648-49 (6th Cir. 2004) ("Mr. Sosa has pointed to no Supreme Court precedent that 'clearly establishes' a federal prohibition of sentencing entrapment.") (citing *Sorrells v. United States*, 287 U.S. 435, 450 (1932)). *See also United States v. Jones*, 102 F.3d 804, 809 (6th Cir. 1996) ("While other circuits have recognized sentencing entrapment, this circuit has never acknowledged sentencing entrapment as a valid basis for a downward departure under the guidelines."); *United States v. Nanez*, 168 F. App'x 72, 77 (6th

---

**2**When a defendant is not being charged as an aider and abettor, but rather as a principal, courts tend to agree that the government need not establish that the defendant knew of *his own* felony status. *See, e.g,*, *United States v. Langley*, 62 F.3d 602, 604-05 (4th Cir. 1995) (en banc) ("Langley argues that . . . the government must prove, in a 922(g)(1) prosecution, . . . that [the defendant] knew, at the time . . . , of his or her prior felony conviction . . . . We disagree.").

In some broad sense, "knowledge of felony status" is arguably an "element of the crime" in many different species of "felon in possession" cases. For instance, what if the defendant had his felony conviction vacated, but it was later reinstated without his actual knowledge? Or, what if the defendant knew that he had been convicted of a crime, but did not know that the crime constituted a felony? Those types of cases present novel questions of *mens rea* under federal criminal law. *Cf. United States v. Reyes*, 194 F. App'x 69, 71 (2d Cir. 2006) (avoiding question because any potential error would have been harmless due to the defendant's presentation of little evidence to corroborate his assertion that he did not know his prior felony conviction had been reinstated).

Here, we confront a particularly unique species of that *mens rea* question: whether a defendant can be presumed to know of *someone else's* felony status. It might make sense to charge someone with knowledge of *his own* felony status, as in *Langley*. However, in this case, we sensibly decide, in line with Congress's language in 18 U.S.C. § 922(d), not to charge a defendant in an aiding-and-abetting case under § 922(g) with knowledge of the principal's felony status. Allowing such convictions to stand would arguably write § 922(d) out of the statute.

Cir. 2006) ("Sentencing entrapment is a legal theory that has been recognized by neither this court nor the United States Supreme Court."). Thus, the error could not possibly have been plain at trial or on appeal. Hence, Gardner's sentencing entrapment challenge cannot be sustained.

**C.      Speedy Trial**

Gardner next argues that he did not receive a speedy trial as required by the Speedy Trial Act. Gardner also argues that his Sixth Amendment right to a speedy trial was violated. We reject both challenges.

**1.      Speedy Trial Act**

The Speedy Trial Act (the "Act") requires dismissal of a criminal case, with or without prejudice, if the defendant is not tried seventy days after his indictment or his first court appearance, whichever occurs later. *United States v. Jenkins*, 92 F.3d 430, 438 (6th Cir. 1996). We review a district court's application of the Act *de novo*. *United States v. Thomas*, 111 F.3d 426, 428 (6th Cir. 1997).

A defendant may establish a prima facie case that the government has violated the Act by showing that he was not brought to trial within the seventy-day period. Once the defendant establishes that prima facie case, the government has the burden of showing that, after taking into account time excludable from the seventy-day period, the defendant was brought to trial during the statutorily mandated period. *Jenkins*, 92 F.3d at 438. Such "excludable time" includes delay due to pretrial motions and continuances. A defendant's excludable time also includes co-defendants' excludable time. *United States v. Snelling*, 961 F.2d 93, 95 (6th Cir. 1991).

Gardner has established a prima facie case that the Act was violated in his case. Gardner was arrested on July 26, 2004. His first appearance in court was a detention hearing held on July 29, 2004. Gardner was then indicted on August 25, 2004, and he was tried beginning on May 17, 2005. Therefore, Gardner's speedy trial calculation begins on the date of his indictment, and Gardner was not tried until 265 days later. This period is not within the seventy days required by the Act. As a result, Gardner has established the requisite prima facie case. *United States v. Dunbar*, 357 F.3d 582, 591 (6th Cir. 2004), *vacated on other grounds*, 543 U.S. 1099 (2005).

Excludable time for pretrial motions includes all of the days during which the court is waiting to receive information necessary to decide a pending pre-trial motion. *Jenkins*, 92 F.3d at 438. If a motion requires a hearing, the entire time from the filing of the motion through the date of the hearing is excludable. *Id.* "Regardless of whether the motion requires a hearing or not, after the court receives all the information necessary to decide a motion, a maximum of thirty days can be excluded on the theory that the court has taken the matter 'under advisement.'" *Id.* (quoting 18 U.S.C. § 3161(h)(1)(J)).

Excludable time may also include delays due to the granting of continuances. 18 U.S.C. § 3161(h)(8). Section 3161(h)(8) of the Act specifically excludes any delay resulting from a continuance granted based upon a judge's finding that the "ends of justice" outweigh the interests of the public and the defendant in a speedy trial. *United States v. Cianciola*, 920 F.2d 1295, 1298 (6th Cir. 1990). Further, the court must set forth, either orally or in writing, its reasons for finding that the ends of justice outweigh the best interests of the public and the defendant in a speedy trial. *United States v. Richmond*, 735 F.2d 208, 214 (6th Cir. 1984).

The Act lists factors that the court is required to consider and some that it is not permitted to consider in granting an "ends of justice" continuance. *Id.* at 215. If the court does not provide properly explainable reasons, the resulting delay is not excludable. *Id.* The decision to grant a

continuance and to exclude the delay is a matter of discretion for the district court and to obtain reversal, a defendant is required to prove actual prejudice. *Cianciola*, 920 F.2d at 1298.

In this case, the government argues that there was no violation of the Act because the district court granted two "ends of justice" continuances. On October 8, 2004, Gardner, Hassell, and McMillion filed motions to continue their trial date, which had been set for November 2, 2004. McMillion and Hassell also filed waivers of speedy trial. Gardner did not. The basis for the three motions was a conflict in trial dates and the need for sufficient time to prepare the matter effectively.

On October 13, 2004, the district court granted McMillion and Hassell's motions and reset the trial date to February 8, 2005. In granting the continuance, the district court wrote:

> The Court specifically finds that interests of justice served by granting the continuance outweigh the interests of the public and the Defendants in a speedy trial on the date previously scheduled. 18 U.S.C. § 3161(h)(8)(A), (B). The Defendants are likely to be prejudiced if they are not adequately prepared for trial despite due diligence, and the public interest will not be served if such prejudice ultimately requires this case to be retried.

The district court also concluded that the period of delay occasioned by the granting of McMillion's and Hassell's motions was reasonable and excludable as to Gardner.

This continuance satisfies the requirements of the Act to create excludable time. It was an "ends of justice" continuance. The district judge considered appropriate factors and provided proper explanations. Therefore, the 124-day period between the filing of the motions on October 8, 2004, and the new trial date of February 8, 2005, is excludable under the Act.

On January 26, 2005, Hassell filed another motion to continue. The basis for this motion was that his counsel had made a good faith effort to prepare for trial on February 8 but had not yet completed all the investigation that she believed was necessary to represent Hassell at trial. Included was a speedy trial waiver signed by Hassell.

On January 28, 2005, the district court granted Hassell's second motion for a continuance and reset the trial date to May 17, 2005. In granting this continuance, the district court wrote:

> The Court specifically finds that the interests of justice served by granting the continuance outweigh the interests of the public and the Defendant in a speedy trial on the date previously scheduled. 18 U.S.C. § 3161(h)(A), (B). The Defendant is likely to be prejudiced if he is not adequately prepared for trial despite due diligence, and the public interest will not be served if such prejudice ultimately requires this case to be retried.

The district court also concluded that the period of delay occasioned by the granting of the motion was reasonable and excludable as to both McMillion and Gardner.

This continuance also satisfies the requirements of the Act to be excludable. It was an "ends of justice" continuance. The district court considered appropriate factors and provided proper explanations. Therefore, the extension of the trial date from February 8, 2005, to May 17, 2005, is excludable under the Act.

The only time period not excludable is the time between Gardner's indictment on August 25, 2004 and the filing of the first motions to continue the trial dates on October 8, 2004, a period of 43 days. Since this period is less than the required seventy days, Gardner's rights under the Act were not violated.

**2.          Sixth Amendment Right To Speedy Trial**

The Sixth Amendment guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial." U.S. Const. amend. VI. In determining whether that right is violated, we often examine the delay that ensued between indictment and trial. *United States v. Watford*, 468 F.3d 891, 901 (6th Cir. 2006) ("[P]ost-indictment delay implicates the Sixth Amendment speedy trial guarantee."). A district court's adjudication of a constitutional speedy-trial claim is reviewed *de novo*. Questions of fact are reviewed for clear error. *Id.* at 900.

The Supreme Court has set forth a balancing approach for determining when a Sixth Amendment speedy-trial violation has occurred. *Barker v. Wingo*, 407 U.S. 514, 523-30 (1972). The following four factors are to be considered: (1) whether the delay was uncommonly long; (2) the reason for the delay; (3) whether the defendant asserted his right to a speedy trial; and (4) whether prejudice resulted to the defendant. *Id.* None of these factors alone is enough to establish a violation and the court is to conduct a balancing analysis that considers each of these factors along with such other circumstances that may be relevant. *Watford*, 468 F.3d at 900 (citing *United States v. Schreane*, 331 F.3d 548, 553 (6th Cir. 2003)).

The length of the delay is a threshold issue. That is, if there is no delay that is presumptively prejudicial, there is no necessity for inquiry into the other factors. *Schreane*, 331 F.3d at 553 (citing *Barker*, 407 U.S. at 530). A delay is presumptively prejudicial if it is "uncommonly long" or "extraordinary." *Id.* (citing *Doggett v. United States*, 505 U.S. 647, 651-52 (1992)). The Sixth Circuit has found that a delay is presumptively prejudicial when it approaches one year. *Id.*

In this case, the delay between the filing of Gardner's indictment and his trial was 265 days, or approximately nine months. Delays several months short of one year are not "uncommonly long," especially in cases involving multiple defendants and pre-trial motions. Accordingly, our examination of this claim "ceases" and we do not consider the other *Barker* factors. *Id.* We reject Gardner's Sixth Amendment speedy-trial claim.

**D.          Violation of T.C.A. 53-11-451**

Gardner's final argument is that the Task Force violated his due process rights by using drugs seized in one Tennessee county (Davidson) in another Tennessee county (Smith), in violation of T.C.A. § 53-11.451. That statute provides:

> (d) Property taken or detained under this section shall not be subject to replevin, but is deemed to be in the custody of the director or the director's authorized representative, agent or employee…, or a sheriff, deputy sheriff, municipal law enforcement officer, or constable, subject only to the orders and decrees of the circuit or criminal court. When property is seized under parts 3 and 4 of this chapter or title 39, chapter 17 part 4, the seizing authority may:
>  …
> (4) Regardless of any other method of disposition of property contained in this chapter, use the property taken or detained, with permission of the court and under such terms and conditions as are approved by the court, for use in the drug enforcement program of the county in which the goods are seized, and/or, with approval of the court having jurisdiction over the property, sell the property and utilize the proceeds for the drug enforcement program of the county in which the property was seized … .

Gardner argues that Tennessee law requires that court permission be obtained to use property seized in one county in a sting operation in another county and that, since court permission was not obtained in his case, his due process rights were violated.

Our precedent squarely mandates rejecting this claim. *United States v. Pipes*, 87 F.3d 840, 843-44 (6th Cir. 1996) (rejecting due-process claim based on alleged violation of T.C.A. § 53-11-451). Officers' use of seized drugs in a reverse sting operation without complying with T.C.A. § 53-11-451 does not violate a defendant's due process rights. Therefore, Gardner's challenge on this score must be rejected.

## III.    CONCLUSION

We reject Gardner's sufficiency-of-the-evidence challenges to three of his four convictions. A rational trier of fact could have found that Gardner conspired to possess cocaine with intent to distribute, that he aided and abetted an attempt to do the same, and that he aided and abetted the possession of a firearm in furtherance of a drug trafficking crime. However, we sustain Gardner's challenge to his aiding-and-abetting conviction under 18 U.S.C. §§ 922(g)(1) and 2 because the government presented insufficient evidence that Gardner knew or had cause to know of the principal's status as a convicted felon. *Cf. Xavier*, 2 F.3d at 1286. We also reject Gardner's sentencing entrapment, Speedy Trial Act, Sixth Amendment, and due process challenges.

However, we need not remand this matter to the district court for resentencing. Gardner was sentenced to two 240-month concurrent sentences, one 120-month concurrent sentence, and one 60-month consecutive sentence. Our reversal of the conviction that carries a 120-month concurrent sentence does not alter Gardner's total sentence of 300 months.

We acknowledge that, in some cases, a district court's total sentencing calculation might be based on the number and quality of the convictions at issue. However, in this case, Gardner's 60-month consecutive and 240-month concurrent sentences are mandatory minimums. 18 U.S.C. § 924(c)(1); 21 U.S.C. § 841(b) ("If any person commits such a violation after a prior conviction for a felony drug offense has become final, such person shall be sentenced to a term of imprisonment which may not be less than 20 years."). Gardner raised no other objections before the district court at sentencing, nor has he challenged those sentences on appeal.

Accordingly, we AFFIRM the district court's judgment on three of Gardner's four convictions and on Gardner's sentence. We REVERSE the district court's judgment on the aiding-and-abetting count under 18 U.S.C. §§ 922(g)(1) and 2 and REMAND the case with instructions to enter a judgment of acquittal on that count.